No. 14607

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

HUBERT C. RUMPH and MARGERY RUMPH,

Plaintiffs and Respondents,

-vs-

DALE EDWARDS, INC., a Montana Corporation,

Defendants and Appellants.

---

Appeal from: District Court of the Sixteenth Judicial District,
Honorable Alfred B. Coate, Judge presiding.

Counsel of Record:

For Appellants:

Sandall & Cavan, Billings, Montana
John R. Carr, Miles City, Montana

For Respondents:

Lucas and Monaghan, Miles City, Montana

---

Submitted on briefs: April 25, 1979

Decided: JUN 6 1979

Filed: JUN 6 1979

*Thomas J. Kearney*
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The controlling issue in this appeal is the propriety of the District Court's decision to grant summary judgment in favor of respondents. As evidenced by the District Court file and the parties' briefs herein, we find that absolutely no genuine issues of material fact are present in this lawsuit and that respondents are entitled to judgment as a matter of law.

The purpose of this appeal is to determine the rightful owner of a small ranch located adjacent to the Powder River near Broadus, Montana. For many years prior to September 22, 1965, this ranch, which consists of approximately 523 acres of land and a residence, was owned by R. C. Hubbard of Broadus, Montana. Hubbard, who is now deceased, was not living on his ranch in the spring of 1965. He allowed Hubert Rumph, one of the respondents herein, to move onto the ranch that spring. A formal lease agreement, dated September 22, 1965, was later executed by Hubbard and Rumph. This lease agreement provided for a term of five years from and after April 1, 1965. The annual consideration for the lease of the property was $523 or $1.00 per acre. The lease agreement contained the following provision granting Rumph the exclusive option to purchase the property:

> "That the Lessor does hereby give and grant to the Lessee, his heirs, executors, administrators and assigns, the exclusive right, privilege and option of purchasing the hereinabove described real property for the sum of Twenty Seven Thoussand Five Hundred Dollars ($27,500.00). That this option may be exercised by the Lessee at any time after April 1, 1968 and not later than April 1, 1970, by giving written notice to the Lessor within the time set forth herein for the exercise of this option. That said notice shall be sent by registered mail to the Lessor at Broadus, Montana."

In February 1969, Rumph decided to exercise his option to purchase the property. This decision was duly communicated to Hubbard who acquiesced to the planned sale.

Hubbard and Rumph concluded that the sale could not be completed in February 1969. Both Hubbard and Rumph became concerned with the possibility that the sale could not be completed prior to April 1, 1970, the expiration date of the option to purchase found in the lease agreement. Therefore, on February 13, 1969, Hubbard and Rumph met at the Hubbard home to resolve this problem. It was mutually agreed that the best way to solve the problem was to extend the lease and option to purchase for an additional ten years. During this conversation, Rumph made notes of the parties' understandings. Later that evening, his wife Margery prepared a document entitled "lease rider" according to the mutually agreed upon terms.

The following day the Rumphs returned to the Hubbard home to execute the lease rider. Bonnie Rumph, a Notary Public, accompanied them to notarize the signatures.

Hubbard and Rumph then examined the lease rider to confirm that it properly reflected the agreement reached the previous day. One significant change contemplated by the parties was an increase in the annual lease payment from $523 to $623.

The lease rider provides in pertinent part that:

". . . this lease shall run for ten (10) more years, expiring on April 1, 1980, instead of April 1, 1970."

The Rumphs' option to purchase the property was extended until April 1, 1980, by the following language of the lease rider:

"That the lessee, Hubert C. Rumph and/or Margery Rumph, has the option to renew this lease as well as the option to buy."

The sum of $523 was paid to Hubbard for the years 1965 through 1969. Pursuant to the terms of the lease rider, the consideration paid in 1970 and all subsequent years was increased to $623.

R. C. Hubbard died on January 7, 1971. At the time of his death, the property in question had not yet been conveyed to the Rumphs. For economic reasons, the decision was made by the attorney and the administrator of Hubbard's estate to sell the property at a public sale. The administrator's sale was duly and properly carried out.

The notice of sale of real property was duly published. That notice stated in pertinent part that: "Ranch subject to surface lease to H. C. Rumph." While no reference was made in the notice to respondents' interest, the purchaser was aware of his interest.

The administrator's sale was conducted in the courtroom of the Powder River County courthouse on October 27, 1972. Prior to that date, Rumph spoke with the attorney for the estate, Robert J. Brooks, and was assured by Brooks that the purchaser at the administrator's sale would take the land subject to Rumphs' lease and option to purchase. The record also reflects that Dale Edwards, the president of the appellant corporation, Dale Edwards, Inc., also spoke with Brooks prior to the sale. In addition, Edwards was provided with a copy of both the lease agreement and lease rider prior to the date of the sale.

Prior to the sale, oral announcements were made by the attorney for the estate to the effect that the sale was subject to the Rumphs' lease and option to purchase. Copies of the lease agreement and lease rider were circulated among prospective purchasers at the sale. Questions were asked

regarding the validity of the lease and option to purchase and Brooks deferred his answers to other attorneys who were present and representing prospective bidders. These facts indicate it was unnecessary to include it in the notice for sale. Purchaser had ample notice.

The property was purchased by Dale Edwards, on behalf of Dale Edwards, Inc. The purchase price was $21,173.40, which was 90 percent of the appraised value of the property. Subsequent to the sale, but prior to the actual closing, Edwards' attorney, Mr. Carr, reviewed an abstract of title to the property. Certain title work had to be done including the acquisition of a quit claim deed from a Mr. Dahl, who held a lien on the property. Considerable difficulty was encountered by Brooks and Carr in obtaining this deed from Dahl. In fact, at one point, cash consideration was offered to Dahl for the deed. At no time was any question raised as to the validity of the Rumphs' lease and option to purchase.

The Rumphs have been in continuous possession of the property since April 1965. They have performed all of their obligations under both the lease agreement and the lease rider. No notice of default has ever been served upon the Rumphs by Dale Edwards, Inc., as required for any breach of the lease agreement. All annual lease payments have been made by the Rumphs to Dale Edwards, Inc., by cashier's checks.

On March 15, 1977, pursuant to the terms of the lease agreement and lease rider, the Rumphs exercised their option to purchase the property for the sum of $27,500. Dale Edwards, Inc., refused to perform under the lease agreement and lease rider and will not convey the property to the

Rumphs. The amount of $27,500, representing full payment for the property, has been tendered to the Clerk of the Powder River County District Court by means of an irrevokable letter of credit.

This suit for specific performance followed Edwards' refusal to convey the property to the Rumphs. Summary judgment in favor of the Rumphs was entered by the District Court from which Dale Edwards, Inc., appeals to this Court.

Before considering the individual issues, we will discuss the validity of the District Court entertaining summary judgment motions in this matter.

Rule 56(c), M.R.Civ.P., provides that summary judgment is proper if:

> ". . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Thus, summary judgment is appropriate when the moving party shows a complete absence of any genuine issue as to all facts which are material in light of those substantive principles which entitle him to a judgment as a matter of law. Harland v. Anderson (1976), 169 Mont. 447, 548 P.2d 613. This Court has consistently held that, under Rule 56, the party moving for summary judgment has the initial burden of establishing the complete absence of any genuine issue of material fact. Mustang Beverage Co., Inc. v. Jos. Schlitz Brewing Co. (1973), 162 Mont. 243, 511 P.2d 1. To satisfy its burden the moving party must make a showing that is quite clear of what the truth is, and exclude any real doubt as to the existence of any genuine issue of material fact. Kober v. Stewart (1966), 148 Mont. 117, 417 P.2d 476.

The primary policy and general purpose underlying Rule 56 is to encourage judicial economy through the prompt elimination of questions not deserving of resolution by trial. Silloway v. Jorgenson (1965), 146 Mont. 307, 406 P.2d 167.

While the initial burden of proof must attach to the moving party, that burden shifts where the record discloses no genuine issue of material fact. Under these circumstances, the party opposing the motion must come forward with substantial evidence raising the issue. Rickard v. Paradis (1975), 167 Mont. 450, 539 P.2d 718; Roope v. Anaconda Company (1972), 159 Mont. 28, 494 P.2d 922; Flansberg v. Montana Power Company (1969), 154 Mont. 53, 460 P.2d 263. Once the burden has shifted, the party opposing the motion is held to a standard of proof which is as substantial as that initially imposed upon the moving party. Harland v. Anderson, supra.

This standard of proof was clearly defined in Silloway v. Jorgenson, 146 Mont. at 310, 406 P.2d at 169, where this Court stated:

> "'. . . the party opposing [the] motion must present facts in proper form--conclusions of law will not suffice; and the opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, nor merely suspicions.'"

We find that all facts material to the legal issues involved in this appeal have been presented. There are no genuine issues of fact. The parties concede that no issues of fact exist in this case.

The individual issues presented to this Court are:

1. Did the District Court properly construe and interpret the terms of the lease agreement and lease rider?

2. Did the District Court err in its adoption of certain oral testimony concerning the circumstances of the execution of the lease rider?

3. Did the District Court err in holding that respondents' option to purchase was not extinguished by the terms of section 67-408, R.C.M. 1947, now section 70-26-207 MCA?

4. Did appellant waive its right to contest the validity or existence of the option to purchase?

The first issue concerns the construction and interpretation of the lease agreement and lease rider. Both parties indicate that a primary question to be answered here is "what do the terms of the contract provide?" We agree.

The intent of the parties to the contracts is determined by reading the lease agreement and lease rider in full. Appellant chooses to dissect the contracts, takes certain isolated words and phrases from them, and argues that these minute pieces express the true intent of the parties rather than an analysis of the contracts in full.

We find that the intent of the contracts is clear. The Rumphs were granted the option to purchase the property in question which will, by its terms, expire on April 1, 1980.

Initially, it is important to note that the lease rider is merely an extension of the lease agreement with certain enumerated changes. In view of the close relationship between these documents, they must be construed together to determine the true intent of Hubbard and Rumph regarding the option to purchase. Section 13-708, R.C.M. 1947, now section 28-3-203 MCA, provides:

> "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

Therefore, in discussing the rules of interpretation, the two contracts herein will be referred to as one.

The following rules of construction are controlling upon this Court in its determination of the intent of the contract. A contract must be construed according to the intention of the parties to the contract at the time of contracting. Section 13-702, R.C.M. 1947, now section 28-3-301 MCA; Brown v. Griffin (1968), 150 Mont. 498, 436 P.2d 695. The language of a written contract governs its interpretation if the language is clear and explicit and does not involve an ambiguity. Section 13-704, R.C.M. 1947, now section 28-3-401 MCA. In the event of an ambiguity, sections 13-702 and 13-713, R.C.M. 1947, now sections 28-3-301 and 28-3-402 MCA, explicitly allow the introduction of extrinsic evidence to explain the true intention of the parties. McNussen v. Graybeal (1965), 146 Mont. 173, 405 P.2d 447.

An ambiguity exists when, taken as a whole, the contract's wording or phraseology is reasonably subject to two different interpretations. S-W Company v. Schwenk (1977), ____ Mont. ____, 568 P.2d 145, 34 St.Rep. 865; Williams v. Insurance Company of North America (1967), 150 Mont. 292, 434 P.2d 395. Where the terms of an agreement are uncertain and ambiguous, parol evidence is admissible to prove the interpretation meant by the parties. Sutton v. Masterson (1930), 86 Mont. 530, 284 P. 264. In addition, where the language of the contract is doubtful and ambiguous, the conduct of the parties under the contract is one of the best indications of their true intent. Brown v. Griffin, supra; Musselshell Valley Farming & Livestock Co. v. Cooley (1929), 86 Mont. 276, 283 P. 213.

This Court stated in Kintner v. Harr (1965), 146 Mont. 461, 472, 408 P.2d 487, 494, that:

> ". . . It is a fundamental rule that in the con-
> struction of contracts the courts may look not
> only to the language employed, but to the sub-
> ject-matter and the surrounding circumstances,
> and may avail themselves of the same light
> which the parties possessed when the contract
> was made. See Merriam v. United States, 107
> U.S. 437, 441, S.Ct. 536, 540, 27 L.Ed. 531,
> 533. To ascertain the intention, regard must
> be had to the nature of the instrument itself,
> the condition of the parties executing it, and
> the objects which they had in view. The words
> employed, if capable of more than one meaning,
> are to be given that meaning which it is ap-
> parent the parties intended them to have.
> 1 Beach on Modern Law of Contracts, 702. See
> Smith v. School District No. 18, 115 Mont. 102,
> 139 P.2d 518; 12 Am Jur, §§ 236, 249."

It is a well-established principle of contractual construction that in interpreting a written instrument, the court will not isolate certain phrases of the instrument to garner the intent of the parties, but will grasp the instrument by its four corners and in the light of the entire instrument, ascertain the paramount and guiding intent of the parties. Mere isolated tracts, clauses and words will not be allowed to prevail over the general language utilized in the instrument. Ward v. Mattuschek (1958), 134 Mont. 307, 330 P.2d 971; Steen v. Rustad (1957), 132 Mont. 96, 313 P.2d 1014. The words of the contract are to be understood in their ordinary and proper sense. Section 13-710, R.C.M. 1947, now section 28-3-501 MCA. Particular clauses of the agreement are subordinate to the general intent of the contract. Section 13-716, R.C.M. 1947, now section 28-3-307 MCA. Any repugnancies in the contract must be reconciled, if possible, by an interpretation which will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the contract. Section 13-718, R.C.M.

1947, now section 28-3-204 MCA. Furthermore, words in a contract which are inconsistent with the general nature of the contract or the main intention of the parties are to be rejected. Section 13-719, R.C.M. 1947, now section 28-3-503 MCA.

One final rule of contractual construction is involved herein. In case of an ambiguity, the language of the contract is to be interpreted most strongly against the party causing the uncertainty to exist. Section 13-720, R.C.M. 1947, now section 28-3-206 MCA. Appellant indicates that since Rumph assisted in the composition of the lease rider and his wife typed the agreement, the agreement should be construed most strongly against the Rumphs. However, this rule of construction has little, if any, applicability in the instant case. The testimony is undisputed that Rumph and Hubbard jointly drew up the terms of the lease rider. Thereafter, Margery Rumph transcribed the agreement reached into its present form. After this transcription, both Rumph and Hubbard reviewed the document to confirm that it corresponded to their agreement. It appears that any ambiguity created was jointly created and that Rumph should not at this point be solely chargeable with the ambiguity. It should also be noted that the original lease agreement was drafted by an unknown attorney at the request of Hubbard.

It is interesting to note that appellant devotes approximately eight pages of its brief to a discussion of the differences between a "lease" and "option to purchase." By means of an extremely technical and somewhat imaginative argument, appellant concludes that the use and placement of the words, "lease" and "option to purchase", indicates that the option to purchase ended with the term of the original

-11-

lease agreement and was not extended to April 1, 1980 by the lease rider. Appellant is picking isolated words and phrases from the two contracts and attempting to rebut their clear and convincing general intent.

It certainly is true that the terms "lease" and "option to purchase" have different meanings. However, all parties interested in this transaction with the exception of Dale Edwards, Inc., considered the option to purchase to be a portion of the lease. The lease agreement is titled just that: Lease Agreement, not Lease Agreement and Option to Purchase. There certainly is no contention, even by Dale Edwards, Inc., that the option to purchase is not a part of that lease. In addition, the notice of sale indicated that the sale was subject to the surface lease to Rumph.

Therefore, we find that the term "lease" as found in the lease rider should be interpreted to mean lease and option to purchase. If it is necessary to dissect the agreements in question to determine their true intent, we find that this dissection is more accurate than the one suggested by appellant.

Appellant comments at length on the Rumphs' financial condition. Appellant indicates that they were unable to arrange financing for the purchase of the land until assisted by their attorney. There is absolutely no evidence in the record to support this assertion. In fact, there is absolutely no conclusive evidence concerning the Rumphs' financial condition. In any event, this entire discussion is moot in that the money was available when the Rumphs ultimately decided to exercise their option to purchase.

In conclusion, when this Court reads the lease agreement and lease rider in total and interprets them by grasping

them by their four corners to determine their overall intent, the conclusion is inescapable that the Rumphs' option to purchase survives until April 1, 1980.

Issue No. 2 involves the propriety of certain oral testimony. Appellant complains that the District Court erred by incorporating certain evidence into its findings of fact. Specifically, appellant finds fault with Findings Of Fact Nos. 3 through 6. Appellant's attack is two pronged, claiming that the evidence is inadmissible first under the parol evidence rule and second under the rules of evidence, specifically the dead man's statute.

We find that the evidence which is the basis of Findings of Fact Nos. 3 through 5 is inadmissible under the parol evidence rule. Montana courts, when called upon to interpret the terms of contracts, have long held that where the terms of the contract are clear and unambiguous the court will not allow parol evidence. Safeco Insurance Company v. Munroe (1974), 165 Mont. 185, 527 P.2d 64; Merritt v. Merritt (1974), 165 Mont. 172, 526 P.2d 1375; and Kielmann v. Mogan (1970), 156 Mont. 230, 478 P.2d 275.

We have held under Issue No. 1, however, that the lease agreement and lease rider are clear and unambiguous, giving respondents a lease and option to purchase until April 1, 1980. The intent of the parties is clear, and the District Court could so find in its Finding of Fact No. 6 without the use of parol evidence.

Appellant further contends that the evidence underlying Findings of Fact Nos. 3 through 5 is also inadmissible under the dead man's statute. Because of our ruling that this evidence is inadmissible under the parol evidence rule, we need not make a finding on this point. It should be pointed

out, however, that the dead man's statute, which was formerly codified at section 93-701-3(3), R.C.M. 1947, has been abolished by Rule 601, Mont.R.Evid.

Issue No. 3 concerns possible violation of section 67-408, R.C.M. 1947, now section 70-26-207 MCA. Appellant alleges that the lease rider is invalid and void as being in violation of section 67-408, which limits the duration of leases of agricultural lands to ten years. There is certainly no doubt that the lands in question are agricultural lands and that the rental arrangement did exist. However, we find that by its terms the lease rider extended the original lease for a term of ten years and ten years only.

It is uncontested that the lease rider was executed on February 14, 1969. Appellant makes an issue of the fact that approximately one year and six weeks were remaining on the term of the lease agreement on the date of execution of the lease rider. This, it argues, supports its contention that the lease rider was the document in effect for the period February 15, 1969 through April 1, 1970. On this basis, appellant alleges that the lease rider is a lease of agricultural lands for more than ten years. It is interesting to note, however, that the lease rider, while an extension of the original lease agreement, contains terms and parties significantly different from the original lease agreement.

As indicated previously, the consideration for the lease was increased by the lease rider. This increased consideration took effect on April 1, 1970, the date the lease rider became effective. In addition, the lease rider contains a provision granting Hubbard the privilege of placing a trailer house on the premises. This provision was

-14-

not contained in the original lease agreement.  Furthermore,
Margery Rumph is a party to the lease rider while only
Hubbard and Hubert Rumph were parties to the original lease
agreement.

By its terms, the language of the lease rider indicates
change from the original lease agreement.  The initial and
closing paragraphs of the document speak to "changes" in the
original lease.  The lease rider was clearly an extension of
the original lease, but upon significantly changed terms.
The case involves a five-year lease with a ten-year renewal
upon substantially changed conditions.  There is no viola-
tion of section 67-408.

The final issue, No. 4, involves possible waiver of
certain rights by appellant.  In its findings of fact the
court determined that appellant, in allowing the Rumphs to
place substantial improvements upon its property after
appellant purchased the same, waived its right to
contest the validity or existence of the option.

The leading case on abandonment in Montana is Conway v.
Fabian (1939), 108 Mont. 287, 89 P.2d 1022.  "Abandonment"
was there defined as:

> ".  .  . the relinguishment of a right; the
> giving up of something to which one is entitled.
> In determining whether one has abandoned his
> property or rights the intention is the first
> and paramount object inquiry.  This intention
> is ascertained not only from the statements
> which may have been made by the owner of the
> property, but also from the acts of the owner
> .  .  ." 108 Mont. at 306, 89 P.2d at 1029.

This definition was recently affirmed in McEwen v. Big Sky
of Montana, Inc. (1976), 169 Mont. 141, 545 P.2d 665.

The term "abandonment" is further explained in 1 Am Jur
2d Abandoned Property §1:

"The term 'abandonment' as applied to property and property rights has acquired a well-defined and technical meaning which is not to be confused with the doctrine of laches or estoppel. In its general sense, abandonment means the act of intentionally relinquishing a known right absolutely and without reference to any particular person or for any particular purpose. Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his ownership, but without vesting it in any other person and with the intention of not reclaiming future possession or resuming its ownership, possession or enjoyment. . ."

To establish an abandonment of property, actual acts of relinquishment accompanied by the intention to abandon must be shown. The primary elements are the intention to abandon and the external act by which that intention is carried into effect. 1 Am Jur 2d Abandoned Property §15.

There is no proof that Dale Edwards, Inc., ever intended to abandon its rights in the leased property. To the contrary, it never recognized the validity of the option, and, indeed, in 1973 following her husband's death, Mrs. Dale Edwards told Margery Rumph that "under no circumstances" would she ever want to sell.

From the time Mrs. Edwards told the Rumphs she did not recognize their right to exercise the option, the question was not raised again until March 1977. At that time, the Rumphs sought to exercise their option and appellant immediately refused to do so. This action ensued.

The Rumphs' improvements consisted of certain repairs upon the leased premises. They were entitled to do so under their tenancy. The repairs and improvements which the Rumphs made upon the property were not inconsistent with their tenancy and in no way gave them any greater rights in the land.

Under these circumstances we find that appellant did not waive its right to contest the validity or existence of the option to purchase. Be that as it may, this is only harmless error and cannot be a basis for reversing the District Court. Halko v. Anderson (1939), 108 Mont. 588, 93 P.2d 956; Hill v. Chappel Bros. (1934), 97 Mont. 305, 33 P.2d 819.

Therefore, the summary judgment granted respondents by the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices